UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 1:21-cv-10596-IT

|  |  |
|---|---|
| **TRICIA THOMAS,**<br>  Plaintiff,<br><br>v.<br><br>**CITY OF BOSTON et al.,**<br>  Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**DEFENDANTS' RESPONSE TO THE PLAINTIFF'S
CONCISE STATEMENT OF MATERIAL FACTS**

1. The events that brought action to the within suit occurred on Mother's Day of May 13, 2018, at the property located at 15 Centervale Park, Dorchester, Massachusetts. (See **Exhibit A,** Police Report).

   Response 1: Undisputed

2. 15 Centervale Park is a multifamily home with two separate units.

   Response 2: Undisputed

3. The Plaintiff, Tricia Thomas resided in the upstairs unit with her two minor children. (See **Exhibit A,** Police Report).

   Response 3: Undisputed

4. Edith Thomas (Plaintiff's Mother), Claude Thomas (Plaintiff's Father), and Dexter Thomas (Plaintiff's brother) resided on the first floor unit at said property. (See **Exhibit A,** Police Report).

   Response 4: Undisputed

5. The ownership of the property is being litigated in Suffolk Superior Court. See Edith Thomas Dep, **Exhibit B** at 11:15-19; See Thomas v. Thomas, 98 Mass. App. Ct. 1108 (2020).

   Response 5: Undisputed

6. The Plaintiff purchased the property from her parents in 2004. Thereafter, the Plaintiff allowed her parents, Edith and Claude to live on the property as tenants. See T. Thomas Affidavit **Exhibit C ¶ 4-5.**

   Response 6: Disputed

   The ownership of the property is being litigated in Suffolk Superior Court.

7. The Plaintiff's brother, Dexter Thomas periodically would reside with Edith and Claude after Plaintiff's purchase of the property. See T. Thomas Aff. **Exhibit C ¶ 5.**

   Response 7: Disputed

   Dexter Thomas has continually lived at 15 Centervale Park for over 20 years. See D. Thomas Dep., **Defs Ex. C**, at 7: 5–6, 8: 20–23, 9: 5–7.

8. The Plaintiff requested that Dexter, Edith and Claude vacate the premises proceeding the incident that brought action to the within suit. See T. Thomas Aff. **Exhibit C ¶ 6.**

   Response 8:

   Undisputed that the cited affidavit portion states that "[s]ince the incident described in this lawsuit," Plaintiff has asked Dexter, Claude, and Edith Thomas to leave her property.

9. The Plaintiff's request to vacate was met with hostility and misrepresentations to who the rightful owner of the house is as Edith and Claude filed a lawsuit claiming that the Plaintiff stole the house from them despite same transferring a deed to the Plaintiff, accepting $400,000 from the Plaintiff, and the Plaintiff paying the mortgage and all associated bills with the property. See T. Thomas Aff. **Exhibit C ¶ 4.**

Response 9: Disputed

The cited affidavit portion does not state that Plaintiff's request to vacate was met with hostility and misrepresentations.

10. On May 13, 2018, Dexter Thomas was harassing the Plaintiff attempting to get in her unit on the second floor. See T. Thomas Deposition, **Exhibit D at** 156: 15-18.

    Response 10: Disputed

    Dexter Thomas did not harass the Plaintiff on May 13, 2018. See D. Thomas Dep., **Defs Ex. C**, at 12–13.

11. Dexter Thomas was engaging in unpredictable behavior due to a potential mental health crisis that left the Plaintiff frightened for her safety. See T. Thomas Deposition, **Exhibit D** 167:15-24.

    Response 11: Disputed

    Dexter Thomas was not engaging in unpredictable behavior. See D. Thomas Dep., **Defs Ex. C**, at 12–13.

12. Dexter's aggressive behavior frightened the Plaintiff which prompted her to call the Boston Police Department as she was seriously concerned Dexter was going to harm her. See T. Thomas Dep; **Exhibit D** at 167 8:24.

    Response 12: Disputed

    Dexter Thomas was not engaging in aggressive behavior. See D. Thomas Dep., **Defs Ex. C**, at 12–13.

13. Two Police officers, Martin Hedderman and Arthur Fritch responded to Plaintiffs call at 15 Centervale Park. See M. Hedderman Dep **Exhibit E;** 27:1-15.

    Response 13: Undisputed

14. Upon the Officers arrival, Dexter Thomas was sitting in his car on the street whereas the Plaintiff was standing on the front porch. See M. Hedderman Dep **Exhibit E;** 33:3-16.

    Response 14: Undisputed

15. The Plaintiff told the Officers that she was concerned with Dexter Thomas's behavior, she was fearful for her safety and did not want Dexter in the house. The officers were hostile towards the Plaintiff laughing at her and calling her names such as idiot. See T. Thomas Dep; **Exhibit D** at 167 15:24.

    Response 15: Disputed.

    The Plaintiff told officers that she did not want Dexter Thomas in the house.  The Plaintiff did not say that she was concerned with Dexter's behavior or was fearful for her safety.  See Police Report, **Defs Ex. A**, at 6; M. Hedderman Dep., **Defs Ex. E**, at 31:13–16.  The officers were not hostile toward the Plaintiff and did not laugh at her or call her names.  See Police Report, **Defs Ex. A**, at 6; M. Hedderman Dep., **Defs Ex. E**, at 28–32.

16. The officers informed the Plaintiff that Dexter Thomas was a legal resident of the property. See M. Hedderman Dep **Exhibit E;** 33:3-16.

    Response 16: Undisputed

17. The Plaintiff understood Officer Hedderman that she must allow Dexter Thomas into the home as it was his current legal residence. Plaintiff went back inside the house after speaking to Officer Hedderman. See T. Thomas Dep; **Exhibit D** at 159: 7-15.

    Response 17:  Disputed

    The cited transcript portion does not state that Plaintiff understood that she must allow Dexter Thomas in to the home as it was his current legal residence.

18. Dexter Thomas left the property and chose to wait for his mother Edith Thomas before

attempting to reenter the property. See M. Hedderman Dep **Exhibit E;** 35:1-2.

Response 18: Undisputed

19. Dexter and Edith Thomas went to the police station after Dexter left the Plaintiffs house. See M. Hedderman Dep, **Exhibit E** at 33:1-2.

Response 19: Undisputed

20. Upon arriving to the police station, Edith Thomas spoke to Officer Hedderman informing him that the Plaintiff was not allowing Dexter Thomas into the property despite Dexter Thomas not attempting to reenter after Officer Hedderman told the Plaintiff he is permitted to enter. See M. Hedderman Dep **Exhibit E;** 33:1-2.

Response 20: Disputed

Edith Thomas told Officer Hedderman that the Plaintiff was preventing her and Dexter Thomas from entering the home. See M. Hedderman Dep., **Defs Ex. E**, at 33–34.

21. Officer Hedderman instructed Edith to go home and if there are further issues to call him and they will return to the property. See **Exhibit A,** Police Report.

Response 21: Undisputed

22. Officer Hedderman spoke to his superior, Defendant Lieutenant Sean Smith who made a conclusory assumption that the Plaintiff was committing a crime and instructed Hedderman to arrest the Plaintiff if they return to the property. See S. Smith Dep **Exhibit F** at 31:12-23.

Response 22: Disputed

Lieutenant Smith told Officer Hedderman that he should use all avenues to persuade Plaintiff not to prevent other family members from entering the apartment. See S. Smith Dep., **Defs Ex. G**, at 28: 8–17. He further said that if Plaintiff could not be persuaded, it would be appropriate to arrest her, but arrest should be avoided if at all possible. See S. Smith Dep.,

**Defs Ex. G**, at 28: 18–24, 29: 1–2.

23. Edith Thomas, Dexter Williams, Malcom Williams, and the Plaintiffs two minor children arrived to the property. See T. Thomas Dep, **Exhibit D** at 176: 19:24.

    Response 23: Undisputed

24. The Plaintiff was standing on the front porch of the property to greet her children on Mother's Day. See T. Thomas **Exhibit D** at 177:3-4.

    Response 24: Disputed

    The video of the incident speaks for itself.

25. However, within seconds of the Edith, Dexter, Malcom's and Peggy Ann Williams arrival, Peggy Ann William stated she was going to have the Plaintiff arrested and then called the police falsely alleging that there was a black woman on the front porch carrying a firearm. See T. Thomas Dep; **Exhibit D** at 179: 18-21, 180:7-13.

    Response 25: Disputed

    No one said that there was a black woman on the front porch with a firearm. See E. Thomas Dep., **Defs. Ex. B**, at 78: 4–7. Police did not receive a call about a black woman on the front porch carrying a firearm. See Police Report, **Defs Ex. A**, at 6.

26. The Plaintiff began to film the family while standing on the front porch because she was in fear of her safety from Dexter's previous hostile outburst. See T. Thomas Affidavit, **Exhibit C ¶ 14.**

    Response 26: Disputed

    The video of the incident speaks for itself.

27. Throughout Plaintiff's video, you can hear and see Peggy Williams on the phone with the police accusing the Plaintiff of carrying a firearm. See T. Thomas Video **Exhibit G.**

Response 27: Disputed

The video of the incident speaks for itself.

28. Malcom and Peggy-Ann Williams kept running up to the Plaintiff threatening her or theatrically acting as if the Plaintiff was threatening them despite the Plaintiff being relatively silent and still. See Video **Exhibit H** and T. Thomas Dep, **Exhibit D 180:** 18-24 to 181: 1-4.

Response 28: Disputed

The video of the incident speaks for itself.

29. Plaintiff is accustomed to her family members falsely accusing her of crimes as they have filed false criminal complaints against her which many have been dismissed as same were determined to be unsupported by facts. See T. Thomas Affidavit, **Exhibit C ¶ 15.**

Response 29:

Undisputed that the cited affidavit portion states that "Peggy-Ann Williams and other family members have filed false criminal complaints against me which majority of have been dismissed."

30. Officer Hedderman and Fritch responded to a calm scene at the property. See T. Thomas Video **Exhibit H.**

Response 30: Disputed

Officer Hedderman responded to the scene, but it was not calm. The video of the incident speaks for itself.

31. Upon Officer Hedderman's arrival he beam lined towards the Plaintiff and aggressively pushed her through the front door. See T. Thomas Dep; **Exhibit D** at 185:22-24- 186:1-3.

Response 31: Disputed

The video of the incident speaks for itself.

32. Officer Hedderman and the Plaintiff were in the home where the Plaintiff began to plead with Officer Hedderman See T. Thomas Dep; **Exhibit D** at 186:1-5.

    Response 32: Disputed

    The video of the incident speaks for itself.

33. Officer Hedderman responded to Plaintiffs pleas by making racial remarks that expressed impossibility for an African American woman to own a house. Said racial remarks were innuendos such as "you don't own no house" and "how you own a house". See T. Thomas Dep; **Exhibit D** at 189:20-23.

    Response 33: Disputed

    The video of the incident speaks for itself.

34. After Officer Hedderman pushed the Plaintiff through the property's entry way and slammed the Plaintiff up against the wall. See T. Thomas Dep; **Exhibit D** at 187:14-17.

    Response 34: Disputed

    Officer Hedderman did not push the Plaintiff or slam her against the wall. See E. Thomas Dep., **Defs. Ex. B**, at 31: 15–19; D. Thomas Dep., **Defs Ex. C**, at 26: 10–24; M. Hedderman Dep., **Defs Ex. E**, at 47–48.

35. Officer Hedderman aggressively grabbed Plaintiff's arms, broke jewelry on her wrist and handcuffed her. See T. Thomas Dep; **Exhibit D** at 195: 1-5.

    Response 35: Disputed

    Officer Hedderman did not aggressively grab Plaintiff's arms or break jewelry on her wrist. See D. Thomas Dep., **Defs Ex. C**, at 26: 10–24; M. Hedderman Dep., **Defs Ex. E**, at 47–48.

36. Officer Hedderman nor his partner Arthur Fritch engaged in investigatory discussion to determine whether the Plaintiff had committed a crime prior to arresting the Plaintiff. See T.

Thomas Affidavit, **Exhibit C ¶ 23.**

Response 36: Disputed

When he arrived at the scene, Officer Hedderman determined that Plaintiff had committed a crime by yelling and screaming and preventing her mother and brother from entering the house.  See M. Hedderman Dep., **Defs Ex. E**, at 51: 1–12.

37. Once the Plaintiff was in handcuffs, Officer Hedderman dragged her down the porch to the front lawn causing injuries to the Plaintiff's ankles and knees. See T. Thomas Dep; **Exhibit D** at 196:11-15.

    Response 37: Disputed

    Officer Hedderman did not drag Plaintiff down the porch to the front lawn.  See D. Thomas Dep., **Defs Ex. C**, at 26: 10–24.

38. Officer Brendan Cavanaugh arrived to the scene to transport the Plaintiff to the correct jail for booking. See B. Cavanaugh Dep, **Exhibit H** at 11:4-7.

    Response 38: Disputed

    Officer Cavanaugh was the transport officer.

39. Despite no Defendant police officer informing the Plaintiff that she was being arrested, Officer Brendan Cavanaugh took custody of the Plaintiff. See T. Thomas Dep, **Exhibit D** at 196:18-19.

    Response 39:

    Undisputed that Officer Cavanaugh was the transport officer.  Prior to Officer Cavanaugh taking custody of the Plaintiff, she was humiliated as shackles were wrapped around her ankles and hands which is a practice rarely used. See T. Thomas Dep, **Exhibit D** at 200:20-21.

Response 40: Disputed

Plaintiff was not placed in ankle restraints.  See D. Thomas Dep., **Defs Ex. C**, at 27: 4–6.

40. Prior to leaving the property, the Plaintiff felt like she was going to die as she was having difficulty breathing and her face was swelling. See T. Thomas Dep, **Exhibit D** at 202:2-6.

Response 41:

Undisputed that the cited transcript excerpt states that Plaintiff had difficulty breathing and her face was swelling.

41. Also at this moment the Plaintiff heard the Officer's conversing about what they should do and contemplating if they should take her to the hospital. See T. Thomas Dep, **Exhibit D** at 202: 20-22.

Response 42: Disputed

42. Officer Brendan Cavaungh transported the Plaintiff to district C-6 in South Boston for booking. See B. Cavanaugh Dep, **Exhibit H** at 11:4-7.

Response 43: Undisputed

43. On the way to the police station Plaintiff heard one of the officers questioning what they were going to book the Plaintiff for and that she didn't do anything. See T. Thomas Dep, **Exhibit D** at 204:12-16.

Response 44: Disputed

When he arrived at the scene, Officer Hedderman determined that Plaintiff had committed a crime by yelling and screaming and preventing her mother and brother from entering the house.  See M. Hedderman Dep., **Defs Ex. E**, at 51: 1–12.  Plaintiff was charged with elder abuse, threats, simple assault, and person disorderly.  See Police Report, **Defs Ex. A**, at 6.

44. As the Plaintiff was waiting to be booked, her cultural African beads were ripped out of hair

causing tremendous pain and anguish. See T. Thomas Dep; **Exhibit D** at 212:12-14.

Response 45: Disputed.

Beads were not ripped out of Plaintiff's hair. See D. Thomas Dep., **Defs Ex. C**, at 26 – 27. Plaintiff's hair appears undisturbed in the booking photo. See Arrest Booking Form, **Defs Ex. A**, at 9.

45. Shortly after Plaintiff's arrival to district C-6, Officer Hedderman arrived to assist with the booking of the Plaintiff. See T. Thomas Dep; **Exhibit D** at 206: 5-9.

    Response 46: Disputed

    There is no evidence that Officer Hedderman assisted with the booking of Plaintiff. See M. Hedderman Dep., **Defs Ex. E**, at 58–60.

46. It became apparent to the Plaintiff that Officer Hedderman was confused as she observed Officer Hedderman talking with Lieutenant Sean Smith over the telephone concerning what crime to charge her with. See T. Thomas Dep; **D** at 207: 4-5.

    Response 47: Disputed.

    Officer Hedderman did not have a phone conversation with Lieutenant Smith after Plaintiff was taken to the police station. See S. Smith Dep., **Defs Ex. G**, at 29:17–20.

47. Finally the Plaintiff was informed she was being charged with Elder Abuse but said disclosure was made after Officer Hedderman had his confusing call with Lt. Smith. See T. Thomas Dep; **Exhibit D** at 207: 4-5, 13-22. And 5-8.

    Response 48: Disputed

    Officer Hedderman did not have a phone conversation with Lieutenant Smith after Plaintiff was taken to the police station. See S. Smith Dep., **Defs Ex. G**, at 29:17–20.

48. While the Plaintiff was being booked she began to feel terribly ill as the stress of an unlawful

arrest that her minor children witnessed was beginning to pile on her. See T. Thomas Dep; **Exhibit D** at 218: 1-7.

Response 49: Disputed

Officer Hedderman had determined that there was probable cause that Plaintiff committed a crime. See M. Hedderman Dep., Defs Ex. E, at 51: 1–12. The cited transcript portion states that Plaintiff had a headache and was having difficulty breathing.

49. Custodial Officers began to worry about the Plaintiff's condition but Officer Hedderman insisted that they ignore the Plaintiff's obvious distress. See T. Thomas Dep; **Exhibit D** at 222:17-19.

Response 50: Disputed

The cited transcript portion does not state that custodial officers were worried about Plaintiff's condition but Officer Hedderman insisted that they ignore her distress.

50. Custodial Police officers were laughing at the Plaintiff as she used the restroom. See T. Thomas Dep, **Exhibit D** at 217:15-17.

Response 51: Disputed

51. Officer Hedderman and other custodial officers did not provide the Plaintiff with privacy that all inmates are entitled to while she was ill on the toilet. See T. Thomas Dep; **Exhibit D** at 218:6-22.

Response 52: Disputed

The cited transcript portion states that Plaintiff had a headache and was having difficulty breathing and that she was "very shocked that you use a restroom in a public area and specifically they didn't do anything to try conceal my body parts . . . ."

52. Plaintiff attended a court hearing to be arraigned for the crime of elder abuse. The video

evidence that Plaintiff recorded was shown at the hearing and all charges were dismissed. See T. Thomas Dep, **Exhibit D** at 236: 1-12.

Response 53: Disputed

The cited transcript portion states that "when the judge saw the video it was apparent that I didn't do the things that was alleged."

53. The Plaintiff has experienced severe emotional distress and has been in continued psychiatric treatment as a result of the unlawful arrest by the Defendant Police officers. See T. Thomas Deposition, **Exhibit D** at 106:11-17.

Response 54:

Undisputed that the cited transcript portion states that Plaintiff has been diagnosed with Post-traumatic stress disorder.

54. The Plaintiff continues to have serious safety concerns about herself and her children as the arrest from the Defendants have impacted her way of living a normal life. See T. Thomas Affidavit, **Exhibit C ¶ 36.**

Response 55: Undisputed that the cited affidavit portion states that Plaintiff has been receiving psychiatric treatment for Post-Traumatic Stress Disorder.

 

Respectfully submitted:

DEFENDANTS BRENDAN CAVANAUGH, MARTIN HEDDERMAN, AND SEAN SMITH

By their attorneys:

Adam N. Cederbaum
Corporation Counsel

/s/ Randall F. Maas
Nicole M. O'Connor (BBO#675535)
Senior Assistant Corporation Counsel
Randall F. Maas (BBO#684832)
Assistant Corporation Counsel
City of Boston Law Department
City Hall, Room 615
Boston, MA 02201
(617) 635-4039 (O'Connor)
(617) 635-4042 (Maas)
Nicole.OConnor@boston.gov
Randall.Maas@boston.gov

**CERTIFICATE OF SERVICE**

I, Randall F. Maas, hereby certify that I served a true copy of the above document upon all parties of record via this court's electronic filing system and upon those non-registered participants via first class mail.

/s Randall F. Maas
Randall F. Maas

Date:  September 9, 2022