UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| TRICIA THOMAS, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 1:21-cv-10596-IT |
| | * | |
| CITY OF BOSTON; BOSTON POLICE | * | |
| DEPARTMENT; SEAN P. SMITH, in his | * | |
| individual and official capacities; MARTIN | * | |
| J. HEDDERMAN, in his individual and | * | |
| official capacities; and BRENDAN E. | * | |
| CAVANAUGH, in his individual and | * | |
| official capacities, | * | |
| | * | |
| Defendants. | | |

MEMORANDUM & ORDER

December 14, 2022

TALWANI, D.J.

Plaintiff Tricia Thomas alleges violations of her constitutional rights and of state common law by three Boston Police officers—Sean Smith, Martin Hedderman, and Brendan Cavanaugh (collectively, the "Officers"). Pending before the court are Sean Smith and Brendan Cavanaugh's Motions for Summary Judgment [Doc. Nos. 82, 83] and Martin Hedderman's Motion for Partial Summary Judgment [Doc. No. 84]. For the following reasons, the Motions are GRANTED.

I.      Factual Background

The following facts are drawn from the summary judgment record and are construed in the light most favorable to Thomas.

A.    *The Property*

Thomas lives at 15 Centervale Park, Dorchester, MA (the "Property") in Unit 2 on the second floor of the two-family building. Pl's Resp. to Defs' Material Facts ¶ 2 [Doc. No. 97]; Pl's Ex. A 1 (Offense/Incident Report) [Doc. No. 96-1]. Thomas's parents, Edith Thomas and Claude Thomas, reside at the Property in Unit 1 on the first floor. Pl's Resp. to Defs' Material Facts ¶ 3 [Doc. No. 97]; Defs' Ex. A (Incident Report) [Doc. No. 85-1]; Edith Dep. Tr. 10:12-19 [Doc. No. 85-2].[1]

The entrance to the two units is from the front porch, where a single door leads to a common hallway. Hedderman Dep. Tr. 28:4-10 [Doc. No. 85-5]. Once inside the common hallway, the front door to Unit 1 is located to the right. Id. at 41:13-16; 43:12-20; Pl's Statement of Material Facts ¶ 4 [Doc. No. 96]. Unit 2 is located up the stairs. Pl's Statement of Material Facts ¶ 3 [Doc. No 96].

B.    *Thomas Calls BPD to the Property*

On May 13, 2018, Thomas called the Boston Police Department ("BPD") because she believed that her brother, Dexter Thomas, was attempting to gain access to her unit, that he was "having a mental episode," and that "he was stalking and engaging in some very scary behaviors." Tricia Thomas Dep. Tr. 156:6-22 [Doc. No. 96-4]. Hedderman and his partner, Officer Arthur Fritch, responded to the call. Pl's Ex. A 1 (Offense/Incident Report) [Doc. No. 96-1]; Dexter Thomas Dep. Tr. 13:23-14:2 [Doc. No. 85-3].

---

[1] Thomas admits in her summary judgment papers that her brother, Dexter Thomas, also lives in Unit 1. Pl's Resp. to Defs' Material Facts ¶ 3 [Doc. No. 97].

The officers spoke with Thomas while she was standing in the doorway to the Property. Thomas explained that she was afraid of her brother, that she owned the Property,[2] and that she did not want him to come in the house. Tricia Thomas Dep. Tr. 167:8-22 [Doc. No. 96-4]; Hedderman Dep. Tr. 26:5-18 [Doc. No. 85-5].

One officer spoke with Dexter Thomas and asked if he resided at the Property. Dexter Thomas Dep. Tr. 14:1-18 [Doc. No. 85-3]; Hedderman Dep. Tr. 29:2-8 [Doc. No. 85-5]. Dexter Thomas stated he did live at the Property, provided his license to confirm the address, and also called his mother, Edith Thomas. Dexter Thomas Dep. Tr. 17:1-19 [Doc. No. 85-3]; Pl's Resp. to Defs' Material Facts ¶ 10 [Doc. No. 97]. Dexter Thomas then handed the phone to the officer and Edith Thomas confirmed that Dexter Thomas had permission to be in her unit. Edith Thomas Dep. Tr. 22:21-23:5 [Doc. No. 85-2]. Hedderman did not know where Edith Thomas was at the time. Hedderman Dep. Tr. 35:18-36:3 [Doc. No. 85-5].

Hedderman told Thomas she had to let Dexter Thomas into the unit where he resided. Id. at 33:5-7; Pl's Resp. to Defs' Material Facts ¶ 12 [Doc. No. 97]. The officers also told Thomas to go back upstairs, which she did. Tricia Thomas Dep. Tr. 167:19-22 [Doc. No. 96-4]. Hedderman did not investigate Thomas's allegations of threats further and told Dexter Thomas to call the police if he needed assistance. The officers and Dexter Thomas then separately drove away. Hedderman Dep. Tr. 31:17-32:15 [Doc. No. 85-5]; Pl's Resp. to Defs' Material Facts ¶¶ 13-14 [Doc. No. 97].

_____

[2] The parties are currently litigating the ownership of the Property in state court. Edith Thomas Dep. 11:15-19 [Doc. No. 85-2]; see Thomas v. Thomas, 98 Mass. App. Ct. 1108 (2020).

C.    *The Family Goes to the BPD Station*

Approximately thirty minutes after the incident, Edith Thomas met Dexter Thomas at the police station. Edith Thomas Dep. Tr. 23:19-24:1; 26:10-17 [Doc. No. 85-2]; Pl's Resp. to Defs' Material Facts ¶ 15 [Doc. No. 97]. Even though the earlier incident involved only Dexter Thomas, Edith Thomas told Hedderman that Thomas was preventing both Edith Thomas and Dexter Thomas from entering the property by standing in the doorway and that she wanted to enter her house. Edith Thomas Dep. Tr. 26:18-27:4 [Doc. No. 85-2]; Hedderman Dep. Tr. 34:1-18 [Doc. No. 85-5]. Edith Thomas then left the police station and drove to the Property with Dexter Thomas's sister Peggy Ann Williams, Peggy's husband Malcolm Williams, and Williams's two children. Edith Thomas Dep. Tr. 28:17-29:1 [Doc. No. 85-2]; Dexter Thomas Dep. Tr. 46:16-47:24 [Doc. No. 85-3]; Pl's Resp. to Defs' Material Facts ¶ 18 [Doc. No. 97].

D.    *Hedderman and Smith's Discussion*

At the station, Hedderman told Smith[3] that Thomas was not allowing her mother to enter the property and that "a mother, elder woman, father, and brother, were prevented from going into their own apartments." Smith Dep. Tr. 23:11-24:1; 25:5-11 [Doc. No. 85-7]. As a patrol supervisor, Smith was "responsible for officers' decisions and actions." Smith Dep. Tr. 16:2-20 [Doc. No. 85-7]. Smith was aware that Hedderman had recently returned from the Property. Id. at 24:16-22. Smith instructed Hedderman to "take all avenues to persuade [Thomas]… to please allow them to enter their apartment." Id. at 25:18-26:11. Smith also instructed Hedderman that if Thomas refused, the only option would be to make an arrest, although he should avoid it if possible. Id.; id. at 28:22-29:2. Smith advised Hedderman on what to charge Thomas with if she

---

[3] At the time, Smith was a Sergeant. Smith currently holds the rank of Lieutenant. Smith Mem. 1, n.1 [Doc. No. 86].

was arrested, namely, "Witness Intimidation Elderly 209A, Threats (209A) (275-2), and Person

Disorderly (272-53)." Pl's Ex. A 2 (Offense/Incident Report) [Doc. No. 96-1]. Id. at 31:8-32:7;

Hedderman Dep. Tr. 64:4-15 [Doc. No. 85-5].[4] Hedderman then left the station to go to the

Property. Hedderman Dep. Tr. 36:4-10 [Doc. No. 85-65].

     E.   *Further Events at the Property*

    When Edith Thomas arrived at the Property, Thomas was on the porch in front of the

door. Edith Thomas Dep. Tr. 29:7-30:7 [Doc. No. 85-2]; Defs' Video Ex J.[5]

    Shortly thereafter, Hedderman and Fritch returned to the Property. Hedderman Dep. Tr.

37:2-16 [Doc. No. 85-5]; Pl's Resp. to Defs' Material Facts ¶ 28 [Doc. No. 97]. Hedderman

approached the porch, and Edith Thomas stated that she needed to get into her apartment. Defs'

Video. Ex. F. 7:49. Hedderman stated that she could enter, and that Dexter Thomas could go in

as well because he lived there. Id. at 7:50. Hedderman also explained that Edith Thomas was

allowed to have visitors in her apartment. Id. at 8:06. Thomas stood on the front porch in front of

the door saying that "he" and "she" are not allowed into the Property. Defs' Video Ex. F. 7:59;

Hedderman Dep. Tr. 38:8-22 [Doc. No. 85-5].[6]

---

[4] Smith recalls that this information about what to charge Thomas with occurred before
Hedderman returned to the Property and that the officers did not call Smith after they returned to
the Property. Smith Dep. Tr. 27:3-5; 33:8-34:7 [Doc. No. 85-7]. Hedderman was not sure if that
conversation occurred before he went to the Property, by phone from the Property with either
Hedderman or Fritch, or on his return to the station. Hedderman Dep. Tr. 54:6-55:17; 60:21-62:3
[Doc. No. 85-5].

[5] Peggy Williams immediately called 911 and stated that Thomas was a licensed gun owner and
that she was not allowing Edith Thomas or Dexter Thomas into the Property. Peggy Dep. Tr.
24:4-6 [Doc. No. 85-9]; Defs' Video Ex. F 0:58-1:40. It is not clear from the record whether this
information was relayed to Hedderman and Fritch prior to the arrest.

[6] Thomas denies that she ever stopped Edith Thomas or Dexter Thomas from entering the first-
floor unit, Tricia Thomas Dep. Tr. 178:19-24 [Doc. No. 96-4], and it is possible that her
comments about "he and she" was referring to Malcolm Williams and Peggy Williams.

Thomas then entered the front door to the Property and the hallway outside of Unit 1. Defs' Video Ex. F. at 8:09; Tricia Thomas Dep. Tr. 186:15-187:3 [Doc. No. 96-4]. By that point, Hedderman had observed Thomas yelling on the porch and then entering the building and closing the door behind her, which he believed was her attempt to prevent Edith Thomas and Dexter Thomas from entering the Property. Hedderman Dep. Tr 45:16-18; 51:3-12; Tr. 52:11-19, 68:7-9 [Doc. No. 85-5]. Based on these observations, Hedderman believed Thomas had committed crimes of disturbing the peace, elder abuse, and threats. Hedderman Dep. Tr 45:16-18; 51:3-12; 68:7-9 [Doc. No. 85-5].

Thomas then entered the hallway outside of Unit 1. Defs' Video Ex. F. at 8:09. Thomas can be heard According to Thomas, Hedderman "forcefully pushed [her] in the house where he pushed [her] against the wall, broke [her] bracelet and aggressively handcuffed [her]." Thomas Aff. ¶ 19 [Doc. No. 96-3]; Defs' Video Ex F. at 8:12 (audio of Thomas stating that the officers are pushing her).[7] Thomas also states that Hedderman said racially-offensive comments to her about the ownership of the house, and dragged her to the front lawn. Id. at ¶¶ 20, 22. Thomas states further that she was not read her Miranda rights before being taken to the police station. Id. at ¶ 26.

Cavanaugh was called to transport Thomas to the station because Hedderman's car was

---

However, Hedderman understood Thomas to be referring to Edith Thomas or Dexter Thomas. See Hedderman Dep. Tr. 38:8-22 [Doc. No. 85-5].

[7] Hedderman states that he gained access to the building without Thomas's consent by putting his foot in the door to prevent Thomas from closing it. Hedderman Dep. Tr. 40:24-42:8 [Doc. No. 85-5]. Thomas disputes that Hedderman put his foot in the door, but offers no evidence other than the video, which does not show Hedderman's foot. Pl's Resp. to Defs' Material Facts ¶ 50; [Doc. No. 97]; Defs' Video Ex. F.

not approved for transport. Cavanaugh Dep. Tr. 18:5-21 [Doc. No. 85-11]; see Defs' Ex. A (Incident Report) 4 [Doc. No. 85-1] (listing Cavanaugh as the transport officer). Cavanaugh had no knowledge of the preceding events, and Thomas was already in handcuffs when he arrived to transport her to the station. Cavanaugh Dep. Tr. 11:16-12:2 [Doc. No. 85-11].

       F.    *Post-Arrest*

After her arrest, Thomas was brought to the police station in Dorchester. Hedderman Dep. Tr. 58:13-19 [Doc. No. 85-5]; Pl's Ex A 2 (Offense/Incident Report) [Doc. No. 96-1]. At some point, Thomas was transferred to the station in South Boston because females were not held at the Dorchester station. Hedderman Dep. Tr. 59:17-22 [Doc. No. 85-5]. In addition, Smith suggested that a court clinician evaluate Smith because he thought her behavior as reported to him was "irrational" in preventing her parents from entering their apartment. Smith Dep. Tr. 30:18-31:7 [Doc. No. 87-7]; Pl's Ex. A 2 (Offense/Incident Report) [Doc. No. 96-1]. Thomas experienced "a series of extremely humiliating events" at the station, including using the restroom without privacy, not having access to toiletries, and overhearing the officers speaking about her. Tricia Thomas Dep. Tr. 217:5-22 [Doc. No. 96-4].[8]

After reviewing the evidence, including videos taken of the event, the district attorney decided to not prosecute the case. Id. at 236:8-22.

**II.    Procedural Background**

Thomas's Substitute Complaint [Doc. No. 1-1] asserted claims against the three Officers

---

[8] Thomas additionally reported that cultural beads were ripped out of her hair, but did not identify any of the Defendant Officers as the perpetrator. See Pl's Statement of Material Facts ¶ 45 [Doc. No. 96]; Tricia Thomas Dep. Tr. 212:10-17 [Doc. No. 96-4] (stating that the "taller police officer" ripped beads out of Thomas's hair).

in their individual and official capacities, the City of Boston, and the BPD. The court granted the City of Boston's <u>Motion to Dismiss</u> [Doc. No. 9] all claims against the City of Boston and the BPD[9] and granted in part the Officers' <u>Motions for Judgment on the Pleadings</u> [Docs. Nos. 25, 27]. <u>See</u> Mem. & Order [Doc. No. 47].

The remaining claims are brought against the Officers under 42 U.S.C. § 1983 for violation of Thomas's Fourth Amendment rights (Count I) and under state law for intentional infliction of emotional distress (Count III), false arrest (Count V), false imprisonment (Count VI), and assault and battery (as to Hedderman and Cavanaugh only) (Count II).

Smith and Cavanaugh move for summary judgment on all claims against them. <u>See</u> Smith Mot. [Doc. No. 82]; Cavanaugh Mot. [Doc. No. 83]. Hedderman seeks summary judgment on all claims except the claims for intentional infliction of emotional distress and assault and battery. <u>See</u> Hedderman Mot. [Doc. No. 84].

### III.    Standard of Review

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material when, under the governing substantive law, it could affect the outcome of the case. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>Baker v. St. Paul Travelers, Inc.</u>, 670 F.3d 119, 125 (1st Cir. 2012). A dispute is genuine if a reasonable jury could return a verdict for the non-moving party. <u>Anderson</u>, 477 U.S. at 248.

---

[9] The BPD is a municipal department and is not an entity that can be sued separately from the City of Boston.

The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). This burden can be satisfied in two ways: (1) by submitting affirmative evidence that negates an essential element of the non-moving party's claim or (2) by demonstrating that the non-moving party failed to establish an essential element of its claim. Id. at 331.

Once the moving party establishes the absence of a genuine dispute of material fact, the burden shifts to the non-moving party to set forth facts demonstrating that a genuine dispute of material fact remains. Id. at 314. The non-moving party cannot oppose a properly supported summary judgment motion by "rest[ing] on mere allegations or denials of [the] pleadings." Anderson, 477 U.S. at 256. Rather, the non-moving party must "go beyond the pleadings and by [his or] her own affidavits, or by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). The non-moving party must demonstrate through "submissions of evidentiary quality, that a trial worthy issue persists." Iverson v. City of Boston, 452 F.3d 94, 98 (1st Cir. 2006). Disputes over facts "that are irrelevant or unnecessary" will not preclude summary judgment. Anderson, 477 U.S. at 248.

When reviewing a motion for summary judgment, the court must take all properly supported evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990). "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment." Anderson, 477 U.S. at 255.

## IV.     Discussion

### A.  *Arrest without Probable Cause Under 42 U.S.C. § 1983 (Count I)*

Thomas' first claim is brought pursuant to 42 U.S.C. § 1983 for violation of her Fourth Amendment right to be free from arrest without probable cause. Sub. Compl. ¶¶ 32-35 [Doc. No. 1-1]. Thomas asserts that Hedderman and Cavanaugh, under the guidance of Smith, failed to exercise ordinary care as police officers, including by failing to conduct a proper investigation, detaining Thomas without probable cause, making racially prejudiced comments, and unlawfully restraining Thomas in violation of the Fourth Amendment.[10]

An arrest is lawful when the arresting officer has probable cause to believe that the person has committed a criminal offense. See, e.g., Beck v. Ohio, 379 U.S. 89, 91 (1964); see Sietins v. Joseph, 238 F. Supp. 2d 366, 375 (D. Mass. 2003) ("If probable cause exists to arrest, then there has not been a constitutional deprivation."). Probable cause "is not a high bar." Kaley v. United States, 571 U.S. 320, 338 (2014). It "does not require the fine resolution of conflicting evidence that a reasonable-doubt or even a preponderance standard demands." Gerstein v. Pugh, 420 U.S. 103, 121 (1975); see United States v. Centeno-González, 989 F.3d 36, 45 (1st Cir. 2021) (quoting United States v. Clark, 685 F.3d 72, 76 (1st Cir. 2012)) ("probable cause is not a creature of certainty and does not require either the level of proof needed to secure a conviction or even an 'unusually high degree of assurance.'").

_____

[10] Thomas also asserts that the Officers failed to read her Miranda rights. However, a failure to do so does not implicate a constitutional right under 42 U.S.C. § 1983. See Vega v. Tekoh, 142 S. Ct. 2095, 2106 (2022) ("In sum, a violation of Miranda does not necessarily constitute a violation of the Constitution, and therefore such a violation does not constitute 'the deprivation of [a] right ... secured by the Constitution.'").

Rather, probable cause exists where "the facts and circumstances within [the officers']

knowledge and of which they had reasonably trustworthy information were sufficient to warrant

a prudent [person] in believing that the [arrestee] had committed or was committing an offense."

United States v. Figueroa, 818 F.2d 1020, 1023 (1st Cir. 1987) (quoting Beck, 379 U.S. at 91).

Although an alleged victim's statement does not automatically establish probable cause to arrest,

see, e.g., Lewis v. Kendrick, 944 F.2d 949, 952 (1st Cir. 1991), "police officers can justifiably

rely upon the credible complaint by a victim to support a finding of probable cause," Forest v.

Pawtucket Police Dep't, 377 F.3d 52, 57 (1st Cir. 2004). Under the collective-knowledge

doctrine, in cases "where law enforcement authorities are cooperating in an investigation… the

knowledge of one is presumed shared by all." Illinois v. Andreas, 463 U.S. 765, 771 n.5 (1983).

     1.  Cavanaugh

Cavanaugh moves for summary judgment on the grounds that he was not the arresting

officer and had no interaction with Thomas other than transporting her post-arrest to the police

station. See Cavanaugh Mem. 2-8 [Doc. No. 87]. Although the Substitute Complaint [Doc. 1-1]

alleged that Officer Cavanaugh arrived at the Property with Hedderman on both of Hedderman's

visits, id. ¶¶ 14, 17, Thomas now acknowledges that Officer Cavanaugh only arrived at the

Property to transport Thomas, after Officer Hedderman handcuffed and arrested her. Pls'

Statement of Material Facts ¶¶ 38-40 [Doc. No. 96]; see Cavanaugh Dep. Tr.  11:16-17:18 [Doc.

No. 85-11] (stating that he arrived at the Property after Thomas was detained). She argues that

"Officer Cavanaugh's lack of action and complacency with the false arrest is an extension to

what [Thomas] endured." Opp. 3 [Doc. No. 100]. But where Officer Cavanaugh did not take any

actions other than transporting Thomas after her arrest, he cannot be held liable for a Fourth

Amendment violation. See Rose v. Town of Concord, 971 F. Supp. 47, 50–51 (D. Mass. 1997)

(holding that "it is presumptively reasonable for a police officer to follow the order of a superior officer so long as that order does not violate a clearly established constitutional or statutory right…although the existence of probable cause is vigorously disputed, nothing in the record suggests that, at the time they took [plaintiff] to the station, the Officers were aware that they did not have probable cause to arrest him."). Accordingly, Cavanaugh's Motion for Summary Judgment [Doc. No. 83] is GRANTED as to Count I.

    2.  Hedderman

Hedderman argues that he had probable cause to arrest Thomas. Hedderman Mem. 4 [Doc. No. 88]. Thomas was arrested for elder abuse, threats, disorderly conduct, and simple assault. See Defs' Ex. A (Incident Report) 6 [Doc. No. 85-1]. "[P]robable cause need only exist as to *any* offense that *could* be charged under the circumstance." LaFrenier v. Kinirey, 478 F. Supp. 2d 126, 136 (D. Mass. 2007), aff'd, 550 F.3d 166 (1st Cir. 2008) (quoting United States v. Bizier, 111 F.3d 214, 219 (1st Cir. 1997)) (emphasis in original); see also Smith v. Town of Barnstable, 2021 WL 1408114, at *3 (D. Mass. Apr. 14, 2021) ("[S]o long as probable cause exists justifying an arrest for some offense, it is of no consequence that the basis stated by the arresting officer is legally invalid."). To determine if Hedderman had probable cause to arrest Thomas, the court considers the facts and circumstances known to Hedderman at that time.

Under Massachusetts law, elder abuse is defined, in relevant part as "an Act or omission which results in serious physical or emotional injury to an elderly person or financial exploitation of an elderly person; or the failure, inability or resistance of an elderly person to provide for him one or more of the necessities essential for physical and emotional well-being without which the elderly person would be unable to safely remain in the community." Mass. Gen. Laws Ann. ch. 19A, § 14 (West). An elderly person for purposes of the statute is an individual over sixty years

of age. Id. The court agrees with Defendants, and Thomas does not dispute, that barring an elderly individual from her apartment denies the person "necessities essential for physical and emotional well-being" and thus constitutes abuse.

Here, Edith Thomas was seventy-five years old at the time of the incident. Edith Dep. Tr. 28:6-9 [Doc. No. 85-2]. Prior to Hedderman's arrival at the Property for the second time that day, Edith Thomas went to the police station and directly reported that Thomas was not allowing her into her apartment. Hedderman Dep. Tr. 34:1-18 [Doc. No. 85-5]. Although the record shows that only Dexter Thomas was being denied entry when Hedderman first arrived at the property (and Hedderman did not know where Edith Thomas was at the time), Hedderman Dep. Tr. 35:18-36:3 [Doc. No. 85-5], he had no information to disbelieve Edith Thomas in her report half an hour later that she was being denied entry. See Forest, 377 F.3d at 57 ("This court has affirmed that police officers can justifiably rely upon the credible complaint by a victim to support a finding of probable cause.").

Notably, Hedderman did not rely only on Edith Thomas's report at the police station to conclude that there was probable cause for an arrest. See B.C.R. Transport Co. v. Fontaine, 727 F.2d 7,10 (1st Cir. 1984) (explaining how probable cause does not always immediately follow from an alleged victim statement). Instead, Hedderman did not arrest Thomas until *after* arriving at the Property and personally witnessing the ongoing scene. See Hedderman Dep. Tr 45:16-18; 51:3-12; 68:7-9 [Doc. No. 85-5]. When Hedderman arrived at the Property for the second time, he observed Thomas blocking the doorway to the Property. Hedderman Dep. Tr. 38:8-22 [Doc. No. 85-5]. Thomas also stated that "he" and "she" were not allowed in the Property, and then entered the Property, closing the door behind her.

"The inquiry into probable cause focuses on what the officer knew at the time of the arrest, and must take into account the totality of the circumstances." LaFrenier, 478 F. Supp. 2d at 136 (D. Mass. 2007). At the time of the arrest, Officer Hedderman had Edith Thomas's report as well as his own first-hand knowledge of Thomas's actions. Whether or not he was correct that Thomas intended to prevent Edith Thomas from entering her unit, it was objectively reasonable under the circumstances to believe that Thomas was indeed blocking Edith Thomas's entry into her home.

A reasonable officer in Hedderman's position would have been justified in believing that Thomas was committing a crime of elder abuse based on his initial interaction with Thomas at the Property, Edith Thomas's complaint at the police station that Thomas was not letting her into her apartment, Edith Thomas's request to enter the property during the Hedderman's second visit to the Property, Thomas standing in front of the Property door when he arrived on the scene, and the observed interaction between the family members.[11] Because Hedderman had probable cause to arrest Thomas for elder abuse, Thomas's 42 U.S.C. 1983 claim against him fails. Accordingly, Hedderman's Motion for Partial Summary Judgment [Doc. No. 84] is GRANTED as to Count I.

3. Smith

Thomas argues that Smith did not have trustworthy information to direct Hedderman to arrest Thomas, and moreover, that there is no evidence to show that Thomas did not let her mother into the house. See Opp. 3 [Doc. No. 99]. Smith argues that his instruction to Hedderman to arrest Thomas for elder abuse if she did not allow Edith Thomas to enter her unit was a prospective instruction that does not violate the Fourth Amendment. See Smith Mem. 5 [Doc.

---

[11] While Officer Hedderman may also have had probable cause to arrest Thomas for other crimes, including disorderly conduct and threats, the court need not address those charges here.

14

No. 86]. Thomas has no contrary evidence as to Smith's instructions to Hedderman prior to Hedderman's return to the house.

After the incident, where the Officers on the scene had probable cause for the arrest, as discussed above, any guidance that Smith may have provided on what specific charges to bring, see Pl's Ex. A (Offense/Incident Report) 2 [Doc. No. 96-1], does not give rise to any claim against him. Further, Smith did not arrest Thomas, nor was he on the scene when Hedderman and Fritch arrested her. See Smith Dep. Tr. 30:14-17 [Doc. No. 85-7]. Accordingly, Smith's Motion For Summary Judgment [Doc. No. 86] is GRANTED as to Count I.

4.   Qualified Immunity

Even if Hedderman, under the direction of Smith, did not have probable cause to arrest Thomas, the Officers would be entitled to qualified immunity.

"Qualified immunity protects government officials from trial and monetary liability unless the pleaded facts establish '(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct.'" Marrero-Mendez v. Calixto-Rodriguez, 830 F.3d 38, 43 (1st Cir. 2016) (quoting Ashcroft v. al–Kidd, 563 U.S. 731, 735 (2011)). "If either of the two prongs is not met—i.e., if the facts do not show a constitutional violation or the right in question was not clearly established—the officer is immune. Either prong may be addressed first, depending on 'the circumstances in the particular case at hand.'" Id. (quoting Pearson v. Callahan, 555 U.S. 223, 236 (2009)). "The first sub-part requires the plaintiff to identify either 'controlling authority' or a 'consensus of cases of persuasive authority' sufficient to send a clear signal to a reasonable official that certain conduct falls short of the constitutional norm." Alfano v. Lynch, 847 F.3d 71, 75 (1st Cir. 2017) (quoting Wilson v. Layne, 526 U.S. 603, 617 (1999)). "The second sub-part asks whether an objectively

reasonable official in the defendant's position would have known that his [or her] conduct violated that rule of law." Id.

Here, the court finds there was no constitutional violation because Hedderman had probable cause to arrest Thomas for elder abuse within the meaning of M.G.L. c. 19A § 14. Even if the officers did not have probable cause, however, there was not a violation of a clearly established right because a police officer is entitled to qualified immunity "so long as the presence of probable cause is at least arguable." Ricci v. Urso, 974 F.2d 5, 7 (1st Cir. 1992). In effect, this means that police officers are protected by qualified immunity even where a court later determines that there was no probable cause for the arrest, so long as the mistake was a reasonable one. See Rivera v. Murphy, 979 F.2d 259, 263 (1st Cir. 1992). "In other words, immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" White v. Pauly, 137 S. Ct. 548, 551 (2017) (quoting Mullenix v. Luna, 577 U.S. 7, 11 (2015)).

Based on the facts and circumstances known to Hedderman, "a reasonably competent police officer could have believed that probable cause existed to arrest." Ricci, 974 F.2d at 6–7. Smith and Cavanaugh did not arrest Thomas, and Smith did not instruct Hedderman to arrest her without a finding of probable cause. Summary judgment for the Defendants is therefore also warranted based on qualified immunity.

  B.  *State Law Claims*

    1.  Intentional Infliction of Emotional Distress (Count III)

Thomas alleges that the arrest without probable cause and the use of force by Cavanaugh and Hedderman proximately caused her severe emotional distress. Sub. Compl. ¶¶ 40-46 [Doc. No. 1-1]. Thomas argues that Smith, as the Officers' supervisor, was acting in concert with them to arrest Thomas, and that his directions led Hedderman to use excessive force against her and

make racially prejudicial remarks during the interaction. See Opp. 5-6 [Doc. No. 99]. Smith

moves for summary judgment, arguing that he had no interactions with Thomas, and that his

supervisory actions do not rise to the level of extreme or outrageous. Smith Mem. 7-8 [Doc. No.

86]. Cavanaugh moves for summary judgment on the grounds that he was not the arresting

officer and had no interaction with Thomas other than transporting her post-arrest to the police

station. See Cavanaugh Mem. 2-8 [Doc. No. 87].[12]

Under Massachusetts law, a plaintiff alleging intentional infliction of emotional distress

must satisfy four elements: (1) that the defendant knew, should have known, or intended to

inflict emotional distress; (2) that the defendant's conduct was "extreme and outrageous"; (3)

that the plaintiff actually suffered emotional distress; and (4) that the plaintiff's emotional

distress was severe. See Galvin v. U.S. Bank, N.A., 852 F.3d 146, 161 (1st Cir. 2017). "Conduct

qualifies as extreme and outrageous only if it 'go[es] beyond all possible bounds of decency, and

[is] regarded as atrocious, and utterly intolerable in a civilized community.'" Id. (quoting Polay

v. McMahon, 468 Mass. 379, 386, 10 N.E.3d 1122 (2014)). "Liability cannot be predicated upon

'mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.'" Foley v.

Polaroid Corp., 400 Mass. 82, 99, 508 N.E.2d 72 (1987) (quoting Restatement (Second) of Torts

§ 46 comment d (1965)).

Here, Smith's role was limited to instructing Hedderman, and potentially Fritch, that

arrest may be necessary if Thomas barred her mother from entering the Property. Smith Dep. Tr.

31:8-32:7 [Doc. No. 85-7]. Smith's testimony is undisputed that in his instructions, he made

---

[12] Hedderman "vehemently disputes the excessive force and emotional distress claims," see
Hedderman Mem. 2, fn. 2 [Doc. No. 88], but has not moved for summary judgment on these
claims, presumably because of the material disputes of fact.

clear that all attempts should be made to resolve the incident without arrest. In contrast to
Johnson v. Town of Nantucket, 550 F. Supp. 2d 179, 183 (D. Mass. 2008), where plaintiff
provided at least circumstantial evidence of the arresting officer's malicious intent by using
racially derogatory language and claiming that he did not need a warrant, Thomas has submitted
no evidence to show that Smith instructed Hedderman to use excessive force or make racial
comments. And as to Cavanaugh, Thomas has made no showing of "extreme and outrageous"
conduct; to the contrary, the record is undisputed that he had a limited role in transporting
Thomas after Hedderman placed her under arrest.

In sum, where there was probable cause for the arrest, Thomas's claim of intentional
infliction of emotional distress based on that arrest fails. See Sholley v. Town of Holliston, 49 F.
Supp. 2d 14, 22 (D. Mass. 1999) ("Police officers do not act in an extreme, outrageous, and
intolerable manner when they make an arrest based upon probable cause, and the distress that
invariably accompanies an arrest, while it can be quite severe, is not beyond the limits of what a
reasonable person can be expected to endure.").

Accordingly, Smith's Motion for Summary Judgment [Doc. No. 82] and Cavanaugh's
Motion for Summary Judgment [Doc. No. 83] are GRANTED as to Count III.

2.   False Arrest and False Imprisonment (Counts IV and V)

Thomas alleges that she was intentionally arrested and detained without probable cause.
Sub. Compl. ¶¶ 49-53 [Doc. No. 1-1]. The common law claims of false arrest and false
imprisonment "are joined at the hip because, in Massachusetts, '[f]alse arrest is a species of the
tort of false imprisonment.'" Finamore v. Miglionico, 15 F.4th 52, 61 (1st Cir. 2021) (quoting
Nuon v. City of Lowell, 768 F. Supp. 2d 323, 336 (D. Mass. 2011)). Where there has been an
arrest, the two torts are interchangeable. See Lewis, 944 F.2d at 954 (affirming lower court's

instruction to the jury that "false arrest legally constituted false imprisonment"). To state a claim for false arrest, a plaintiff must establish that "(1) the defendant(s) intended to confine the plaintiff; (2) the plaintiff was conscious of the confinement; (3) the plaintiff did not consent to the confinement; and (4) the defendant[s] had no privilege to cause the confinement." Calero-Colon v. Betancourt-Lebron, 68 F.3d 1, 3 n.6 (1st Cir. 1995). Although lack of probable cause is not an element of false arrest, the existence of probable cause defeats the claim. See Santiago v. Fenton, 891 F.2d 373, 383 (1st Cir. 1989) ("at the foundation of all the claims [including false arrest and section 1983] is the necessity that the arrest be supported by probable cause").

Where the court has held that Hedderman had probable cause to arrest Thomas, see Sec. IV.A.2, Cavanaugh's role was limited to transporting Thomas post-arrest, see Sec. IV.A.1, and Smith did not instruct Hedderman to arrest Smith pretextually, see Sec. IV.A.3, Smith's Motion for Summary Judgement [Doc. No. 82], Hedderman's Motion for Partial Summary Judgment [Doc. No. 84], and Cavanaugh's Motion for Summary Judgment [Doc. No. 83] are GRANTED as to Counts IV and V.

3.  Common Law Immunity

Even if Hedderman, under the direction of Smith, did not have probable cause to arrest Thomas, and Cavanaugh's transport of Thomas was somehow improper, they are shielded under common law immunity for the commission of intentional torts involving discretionary functions.

Thomas is correct that public officials in their individual capacities can be liable for intentional torts. See Pollard v. Georgetown Sch. Dist., 132 F. Supp. 3d 208, 232 (D. Mass. 2015). However, public officials in their individual capacities are "not liable for negligence or other error in the making of an official decision if the official acted in good faith, without malice, and without corruption." Najas Realty, LLC v. Seekonk Water Dist., 821 F.3d 134, 146 (1st Cir.

2016); see also Caisse v. DuBois, 346 F.3d 213, 218 (1st Cir. 2003). While common-law immunity does not apply to ministerial acts, see Breault v. Chairman of Bd. of Fire Comm'rs of Springfield, 401 Mass. 26, 33 n.7, 513 N.E.2d 1277, 1281 (1987), the determination of probable cause to arrest is a discretionary function, see Horta v. Sullivan, 4 F.3d 2, 12 (1st Cir. 1993) (quoting Gooden v. Howard County, 954 F.2d 960, 964 (4th Cir. 1992) (en banc)) ("Generally, police exercise 'inescapably discretionary functions replete with close judgment calls.'"). Common law immunity has thus been applied to false imprisonment and false arrest claims under Massachusetts law. See, e.g., Holden v. Barry, 501 F. Supp. 3d 11, 15 (D. Mass. 2020).

Even as applied to intentional torts, the Supreme Judicial Court has held that "[a public official's] conduct and actions are covered by the rule that '[t]here is every presumption in favor of the honesty and sufficiency of the motives actuating public officers in actions ostensibly taken for the general welfare.'" S. Bos. Betterment Tr. Corp. v. Bos. Redevelopment Auth., 438 Mass. 57, 69, 777 N.E.2d 812, 820 (2002) (quoting Foster from Gloucester, Inc. v. City Council of Gloucester, 10 Mass. App. Ct. 284, 294, 407 N.E.2d 363 (1980)). For example, the court applied common-law immunity to an intentional tort claim for invasion of privacy under Massachusetts law, finding there was no evidence from which a jury could inter that the defendants acted with bad faith or malice. Nelson v. Salem State Coll., 446 Mass. 525, 538, 845 N.E.2d 338, 349 (2006).

Here, Thomas has not presented evidence that Hedderman arrested her in bad faith or with malice or that Cavanaugh transported her in bad faith or with malice. Further, nothing on the record suggests that Smith instructed Hedderman to arrest Thomas with bad faith or malice; instead, he instructed Hedderman to try to avoid arrest if possible. Accordingly, summary judgment on these state law claims is also warranted based on common law immunity.

**V.      Conclusion**

For the foregoing reasons, Smith and Cavanaugh's <u>Motions for Summary Judgment</u>

[Doc. Nos. 82, 83] and Hedderman's <u>Motion for Partial Summary Judgment</u> [Doc. No. 84] are

GRANTED.

IT IS SO ORDERED.

December 14, 2022                                              <u>/s/ Indira Talwani         </u>
                                                               United States District Judge